IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DAVID STOCKDALE and TINA
STOCKDALE,

       Plaintiffs

         v.               CIVIL NO. 08-2120 (JP)

DORAL FINANCIAL CORP., et al.,

       Defendants

## OPINION AND ORDER

Before the Court is Defendants Doral Financial Corporation, Glen Wakeman, Gerardo Leiva, and Marangal Domingo's motion for summary judgment (No. 42), and Plaintiffs David Stockdale and Tina Stockdale's opposition thereto (No. 54). Plaintiffs filed the instant action alleging the following causes of action under the Puerto Rico Civil Code: (1) breach of contract pursuant to P.R. Laws Ann. tit. 31, §§ 3371, *et seq.,* and 3401, *et seq.*; (2) fraudulent inducement pursuant to P.R. Laws Ann. tit. 31, §§ 3401, *et seq.*, 3431, *et seq.,* and 5141, *et seq.*; (3) breach of promise pursuant to P.R. Laws Ann. tit. 31, §§ 3431, *et seq.,* 3371, and 5141, *et seq.*; and (4) tort pursuant to P.R. Laws Ann. tit. 31, § 5141. Defendants move for summary judgment, arguing that the evidentiary record indicates the absence of any genuine issues of material fact. For the reasons stated herein, Defendants' motion for summary judgment (**No. 42**) is **GRANTED IN PART AND DENIED IN PART.**

CIVIL NO. 08-2120 (JP)            -2-

## I.   MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The following material facts were deemed uncontested by all parties hereto at the April 14, 2009, Initial Scheduling Conference (No. 30).

1. David Stockdale is of legal age, married to Tina Stockdale, who at relevant times occupied the position of Senior Vice President at Doral Financial Corp. / Doral Bank, in charge of collections.

2. Tina Stockdale is of legal age, married to David Stockdale, with domicile in the U.S.A., who at relevant times was Senior Vice President and Director of Retail Operations of Doral Financial Corp. / Doral Bank.

3. Doral Financial Corp. ("Doral") is a duly organized corporation that operates a financial institution covered by federal and state laws under the name of Doral Bank. At relevant times Doral was the employer of the Plaintiffs. Doral is registered as a corporation in Puerto Rico or in a state other than Illinois.

4. Glen Wakeman ("Wakeman") is of legal age, resident of Puerto Rico and Chief Executive Officer of Doral.

5. Gerardo Leiva ("Leiva") is of legal age, and was at all times relevant to the complaint an Officer of Doral. He is brought here as a Defendant in his official and personal capacity.

CIVIL NO. 08-2120 (JP)          -3-

6.   Marangal Domingo ("Domingo") is of legal age, and was at
     all times relevant to the complaint an Officer of Doral.
     He is brought here as a Defendant in his official and
     personal capacity.

7.   Plaintiff David Stockdale has experience in the banking
     industry, with particular emphasis in the collections
     area.

8.   Plaintiff Tina Stockdale has experience in the area of
     banking operations.

9.   Paul Makowski ("Makowski") approached David Stockdale and
     asked him if he would be interested in coming to work for
     Doral Bank.

10.  At that time David and Tina Stockdale were living in the
     Philippines.

11.  In 2007, Doral, through its Chief Risk Manager, Makowski,
     offered David Stockdale a position in the bank as
     Director, Collections, with a corporate title of Senior
     Vice President.

12.  There were several conversations between David Stockdale,
     Makowski and the Defendants regarding the terms and
     conditions of the employment offer to David Stockdale.
     David Stockdale conditioned his acceptance on his wife's
     employment by Doral.

CIVIL NO. 08-2120 (JP)          -4-

13.  Before accepting the offer, David Stockdale stated that
     the only condition he had was that his wife, Tina
     Stockdale, would also be recruited by the bank.  As a
     result, Doral interviewed Mrs. Stockdale on several
     occasions.

14.  Defendants informed David Stockdale that they were
     interested in Tina Stockdale's services also, and would
     make her an employment offer to move to Puerto Rico.

15.  As part of the process, on July 18 and 30, 2007,
     respectively, David and Tina Stockdale executed identical
     confidentiality agreements with Doral as a condition to
     receive confidential and non-public information regarding
     Doral's finances, operations, and plans for the sole
     purpose of evaluating a possible employment opportunity
     with Doral.   Said confidentiality agreements are
     incorporated by reference herein.

16.  Tina Stockdale met and was interviewed by Calixto
     García-Vélez, President of Doral Bank, who explained that
     they were going to segment Operations into Retail Banking
     Operations and that she would be responsible for all back
     office functions for Retail Banking.

17.  On the evening of July 31, 2007, Tina Stockdale spoke over
     the phone with Co-defendant Wakeman, CEO, Doral Bank.  He

CIVIL NO. 08-2120 (JP)          -5-

also explained his plan to build a "niche," a hispanic bank, and to sell it within 3 to 5 years.

18. Tina Stockdale was called to Ivonne Gómez's office, where the letter containing the terms of the job offer was delivered to her.

19. Ivonne Gómez explained the relocation benefit, to be received through Dave. She stated that the exact terms of the equity program was pending the Board of Directors' approval. Plaintiff's drug test was scheduled on said date, to be taken the following day.

20. Plaintiffs had a telephone conversation with Ivonne Gómez, regarding the relocation package and the equity plan.

21. Tina Stockdale stated the need to clarify the amount of her signing bonus, it had to cover or compensate for the loss of the salary increase she would have obtained if she remained with H.S.B.C. Ivonne Gómez referred the matter to Lesbia Blanco, who assured and re-stated that the signing bonus would be $200,000.

22. On July 30, 2007, an offer letter outlining certain terms of employment was issued by Ivonne Gómez to David Stockdale. Said letter is incorporated by reference herein.

23. On August 1, 2007, David Stockdale accepted the employment offer as stated. As to Tina Stockdale, based on her

CIVIL NO. 08-2120 (JP)          -6-

    interviews, on August 1, 2007, Doral offered her the position of Director, Retail Operations, with a corporate title of Senior Vice President.

24. On August 1, 2007, an offer letter outlining certain terms of employment was issued by Ivonne Gómez to Tina Stockdale.   Said letter is incorporated by reference herein.

25. The only differences between David and Tina Stockdale's employment offers were that Tina Stockdale was to receive an annual base salary of $300,000.00, and that she was going to receive a hiring bonus of $200,000.00.

26. Initially, Tina Stockdale was skeptical as to the offered signing bonus amount, which originally was $100,000.00.

27. Pursuant to her request for an increase, Doral increased its offer to $200,000.00, which Tina Stockdale accepted.

28. On August 6, 2007, Tina Stockdale accepted the employment offer.

29. When she accepted, Tina Stockdale stated that she needed two (2) weeks to end her employment relationship with her employer at that time.

30. Doral accepted Mrs. Stockdale's request.

31. On October 11, 2007, Astrid Costa sent Plaintiff Tina Stockdale an e-mail indicating that the hiring bonus check was ready.

CIVIL NO. 08-2120 (JP)          -7-

32.  Tina Stockdale was presented with a "Hiring Bonus Repayment Agreement" for her to sign.  Said document is incorporated by reference herein.

33.  On October 15, 2007, Ivonne Gómez, Leiva, and Tina Stockdale met in the Human Resources Office.  Ivonne Gómez stated that Tina Stockdale had to sign the document to receive the hiring bonus.

34.  Tina Stockdale refused to sign the document.

35.  Tina Stockdale told Ivonne Gómez that she did not know of the agreement's existence, and that she felt that her employment conditions had been altered.

36.  Thereafter, Lesbia Blanco asked Tina Stockdale again why she was refusing to sign the agreement and Tina Stockdale simply stated that she was not told before of its existence, reason for which she stood on her position.

37.  Lesbia Blanco finally told Tina Stockdale that she wanted her to re-think her decision and that they should meet again to discuss this matter.

38.  Lesbia Blanco and Tina Stockdale met again on October 16, 2007.

39.  On October 19, 2007, Lesbia Blanco scheduled a meeting with Tina Stockdale to discuss the pending matter.  During the meeting, Tina Stockdale presented two options to allegedly solve the issue.   First, Tina Stockdale

CIVIL NO. 08-2120 (JP)        -8-

suggested that a note be included in the Hiring Bonus Repayment Agreement stating that she was going to sign under duress.  Second, Tina Stockdale proposed that a memorandum be added to her personnel file stating that she had signed the Hiring Bonus Repayment Agreement under duress.  During that meeting Tina Stockdale tendered the signed "Hiring Bonus Repayment Agreement" with a handwritten note.

40.  Lesbia Blanco responded that she would consider these options and get back to her.

41.  Ivonne Gómez invited Plaintiff Tina Stockdale to meet. When Tina Stockdale arrived at the meeting, Leiva was there.  Ivonne Gómez informed Plaintiff that Doral was not accepting the signed Repayment Agreement with the handwritten note, nor her letter to the file.  Ivonne Gómez further informed Tina Stockdale that, since Plaintiff had not signed the Agreement, she was terminated.

42.  Tina Stockdale was terminated on October 22, 2007.

43.  Plaintiff Tina Stockdale's identification card, cell phone, and keys, were requested by Ivonne Gómez. Plaintiff was escorted to her office by Ivonne Gómez who remained with her while she picked up her things.

CIVIL NO. 08-2120 (JP)          -9-

44. After Tina Stockdale's employment with Doral was terminated, David Stockdale continued to work for Doral for approximately five months.

45. Since David Stockdale's hire date, he maintained the same position, responsibilities, salary, and fringe benefits.

46. On March 15, 2008, David Stockdale resigned from his employment at Doral because, in his own words, his wife was terminated by the bank "without good reason" and "in alleged breach of the terms of the contract."

47. According to David Stockdale, that created a "stressful position in his home and in work" because he was "alone in Puerto Rico with no family and friends."

48. In his resignation e-mail, David Stockdale stated that, if he had known that Tina Stockdale was not going to have a job in Puerto Rico, he would not have accepted a position at Doral.

49. As a result, according to David Stockdale, he was forced to make a choice between Doral and his family, reason for which he decided to resign from his employment at Doral.

The following facts are deemed uncontested by the Court because they were included in the motion for summary judgment and opposition

CIVIL NO. 08-2120 (JP)            -10-

and were either agreed upon, or they were properly supported by evidence and not genuinely opposed.[1]

    1.   David Stockdale has ample experience in the banking industry, with particular emphasis in the collections area.  David Stockdale had been unemployed since December 1, 2005, when he retired from HSBC.

    2.   David Stockdale has a degree in economics from Ripon College; an MBA in finance from Northern Illinois University and more than 28 years of experience in the financial field.

    3.   David Stockdale's experience in banking includes positions in which he has set policy for the organization as a Senior Vice President and Director, and making presentations and recommendations to high level management committees.

    4.   Tina Stockdale has more than 18 years of experience in banking operations, including positions with global responsibilities.

    5.   David Stockdale manages the Stockdales' finances and investment portfolio.  The current value of the Stockdales' investment portfolio is $3,000,000; including real estate investment holdings in Michigan, Phoenix, and

---

1.   The Court has eliminated from this section proposed facts which are duplicates of facts agreed to at the ISC and already listed above.

CIVIL NO. 08-2120 (JP)          -11-

> in Turks and Caicos; cash, and stock and bonds exchange traded funds ("ETFs").

6.   To manage the investment portfolio David Stockdale researches financial websites such as Vectorvest.com and Investors.com; reads articles published by Fischer Investments and Morningstar newsletters. David Stockdale also reads the Wall Street Journal and took a course in options.

7.   After joining Doral, Makowski assessed the needs of the company and determined that David Stockdale could potentially be an asset to the company. Makowski knew David Stockdale because had been a direct report of Makowski at HSBC and other companies.

8.   On July 3, 2007, Makowski contacted David Stockdale in the Philippines to discuss and explain the opportunities that were available at Doral. At the time, Doral was in the process of completing a recapitalization and undergoing a "turnaround" that was expected to take three (3) to five (5) years.

9.   Makowski believed that at Doral, David Stockdale had an opportunity to resume employment, earn an income, and potentially participate in the growth of the company.

CIVIL NO. 08-2120 (JP)          -12-

10.  During the July 3, 2007 conversation, Makowski told David
     Stockdale that Doral was undergoing changes, was looking
     to recapitalize, and was a "turnaround."

11.  David and Tina Stockdale's initial interest in the
     possible opportunities at Doral was that they would both
     be working in the same location and working the same
     shift.

12.  David Stockdale researched Doral's website but discounted
     much of the information because Makowski told him that the
     bank was undergoing a major transformation.  Despite the
     fact that as of July 3, 2007, David knew that Doral was a
     public company, he did not access Doral's filings with the
     Securities and Exchange Commission ("SEC").

13.  David Stockdale arrived in Puerto Rico on July 18, 2007,
     and had dinner with Paul Makowski.  During the dinner
     Makowski allegedly showed David a presentation that
     included "a lot of accounting detail" and "the five (5)
     year financial plan."  David Stockdale perceived that
     Makowski was excited about the level of talent of the new
     management team and that Makowski was confident that the
     growth plan would be successful.

14.  As to the growth plan, during the July 18 dinner Makowski
     and David Stockdale talked about Doral going "from losing

CIVIL NO. 08-2120 (JP)          -13-

money to profitability" but David does not recall the profit projections.

15. On July 19, 2007, David Stockdale met and interviewed with Doral executives.

16. During the July 19, 2007, interviews, David Stockdale met with Christopher Poulton, Doral's Chief Strategy Officer. Poulton told David about potential strategies for Doral. "[O]ne potential strategy would be for [Doral] to be a bilingual bank offering services to Mexico, the Caribbean, [and] Florida." This strategy would allow the bank to grow, become more profitable, and very attractive as a potential target for a takeover. The other potential strategy that Poulton discussed with David Stockdale was Doral "[b]ecoming more of like a neighborhood bank where you'd come in and I guess get comfortable with the people and the bank specifically."

17. During the interview process David Stockdale also met with Lesbia Blanco, Doral's Chief Talent and Administration Officer. David recalled that Blanco was concerned about whether he was committed to the bank for long enough. Specifically, during the interview Blanco allegedly told David Stockdale: "You know, we need people to come here and turn around the bank." David also stated that it was very clear that the bank wanted someone to commit to

CIVIL NO. 08-2120 (JP)          -14-

five (5) years, maybe three (3), if Doral got sold sooner than that.  However, David Stockdale knew that it was possible that the bank would not be sold.

18.  As to Lesbia Blanco's interest in having someone commit to "five (5) years, maybe three (3) years," David Stockdale explained that Blanco did not want to invest in someone that would start working out some plans and then leave in a couple of months.  This would have forced Doral to start looking for someone to execute the plan.

19.  During the interview process David Stockdale also met with Ivonne Gómez, Doral's Senior Vice President of H.R. Services.  Gómez and David talked about his background, what it would be like to live in Puerto Rico, Doral, and its new direction.

20.  Regarding his interview with Calixto García, David Stockdale described García as animated and excited about growth. García shared the growth strategy and allegedly told David "We've got this five (5) year plan.  And we need people to be here for the three (3) to five (5) years.  We've got this equity program, a plan to make sure that people stay all the way to the end."

21.  As to the discussion with Calixto García about the equity program, David Stockdale only recalled that García said

CIVIL NO. 08-2120 (JP)          -15-

"that there was one, that it was lucrative, and would be . . . in a three (3) to five (5) year type of range."

22. Leiva's meeting with David Stockdale included a discussion about people, processes, and technology.  They also talked about "the growth plan . . . how good it would be, and they need a commitment for a long time."  David Stockdale does not recall what Leiva said about commitment.

23. David Stockdale also interviewed with Wakeman, Doral's Chief Executive Officer, who talked about the plan to grow the bank, make it more profitable, and "monetizing the bank."  Wakeman also allegedly told David Stockdale that DFC was "putting together" an equity program, talked about the plan in broad strokes, and expressed that he was fairly sure that the board would approve the plan, and that it would be very lucrative.

24. Domingo, Doral's Chief Financial Officer, told David Stockdale that they were putting together an equity program that was expected to be lucrative.  Domingo also told David that the bank was losing money and discussed the plans to turn it into a profitable bank.

25. Before Tina Stockdale interviewed with Doral officials on July 30, 2007, Tina only had one conversation with Makowski to understand the potential position or role that she would be interviewing for in Doral.  Tina also had a

CIVIL NO. 08-2120 (JP)          -16-

"meet & greet" type of conversation with Leiva during which there was no discussion on compensation.

26. Sometime at the end of July 2007, Tina Stockdale was interviewed by several Doral Bank executives.

27. As to the plan to sell the bank within three to five years, Makowski testified that "the hope was that such an event could materialize."

28. On July 30, 2007, Doral Bank offered David Stockdale a position in the bank as Director, Collections, with a corporate title of Senior Vice President.  Doral's offer included:

i.   Annual base salary -- $250,000

ii.  Performance bonus 40% of base pay based on the performance appraisal

iii. Monthly car allowance $630.00

iv.  "You will be eligible to participate in any equity programs available for your level"

29. David Stockdale conditioned his acceptance of the employment offer on his wife's employment by Doral.

30. The fact that David Stockdale conditioned his acceptance of the employment offer to his wife's hiring did not alter the fact that Tina Stockdale was expected to behave professionally.

CIVIL NO. 08-2120 (JP)          -17-

31.  When David Stockdale received the employment offer he knew that the equity program had not been approved and the reverse split had not occurred.  David Stockdale expected the equity program to start "probably" on January 1, 2008.

32.  Makowski testified during his deposition that, while the turnaround was expected to take three to five years and that he hoped that David would stay that length of time, there wasn't a commitment with David to stay for any particular length of time.

33.  Regarding David Stockdale's employment at Doral, (i) David was not required to leave the bank after his fifth year of employment; (ii) other than not being vested in the equity program, there were no consequences if David Stockdale resigned his employment before the fifth anniversary; (iii) no one guaranteed a number of years of employment; and, (iv) the employment offer is silent as to any period of employment.

34.  On August 1, 2007, Doral Bank offered Tina Stockdale a position in the bank as Director, Retail Operation, with a corporate title of Senior Vice President.  Doral's revised offer included the following:

i.   Annual base salary -- $300,000

ii.  Monthly car allowance $630.00

CIVIL NO. 08-2120 (JP)          -18-

       iii. Performance bonus 40% of base pay based on the performance appraisal

       iv.  Hiring Bonus $200,000

       v.  "You will be eligible to participate in any equity programs available for your level"

36. On August 2, 2007, David and Tina Stockdale had dinner with Paul Makowski.  During the dinner they discussed the compensation package that David and Tina had received. They also discussed Doral's plans, expected growth, and turnaround strategy for the next three to five years.  As to the equity program referenced in the offers of employment, David and Tina claim that Makowski told them that Doral would grant each of them 25,000 shares of common stock valued at $20 per share after the 1:20 reverse stock split.

37. David Stockdale testified during his deposition that Ivonne Gómez told Tina Stockdale that Lesbia Blanco called to inform that the equity program had been approved by the Board. When Tina and Ivonne went over the details Tina was surprised to learn that the 25,000 shares were to be priced at $1.00, the pre-split price, rather than $20.00 per share, the post-split price.

38. David Stockdale talked to Makowski about the different versions regarding the price of the stock.  David

CIVIL NO. 08-2120 (JP)          -19-

Stockdale testified that, following a conversation with Wakeman, Makowski confirmed that the Board had approved the equity program and that the price of the stock would be $20.00, "expecting it to get up to a hundred ($100.00)."

39. Regarding Doral's expected growth, David Stockdale was aware that it was based on models or expectations and that many factors could affect the price of the stock, including market risks and the fact that the economy of Puerto Rico was in a recession.

40. Doral had a stock option program that was discontinued in 2007 when the company was recapitalized in July 2007.

41. In November 2007 David Stockdale was told that Doral was still working on the details of the equity program.

42. On May 7, 2008, Doral's stockholders approved a Stock Incentive Plan. The plan provides for the grant of stock options and stock appreciation rights such as restricted stock or restricted stock units.

43. Regarding the expectations of the future value of the stock, Makowski testified during his deposition that there was no formal plan -- and there could never be such a plan -- that stated that the stock would reach a particular number because of the way the market works. While the potential participants in the stock option plan could hope

CIVIL NO. 08-2120 (JP)          -20-

> that the stock would appreciate significantly, the bank couldn't possibly forecast the price of the stock in the future.

44. Tina Stockdale began to work for Doral Bank on October 1, 2007.

45. In 2006, Lesbia Blanco introduced the Hiring Bonus Repayment Agreement into Doral's hiring practices. Blanco modeled the repayment agreement on her previous employment experiences and the fact that such agreements were common in many industries, including the banking industry.

46. Tina Stockdale refused to sign the Hiring Bonus Repayment Agreement because she believed that the terms of the repayment agreement changed the terms and conditions of the employment offer dated August 1, 2007.

47. Tina Stockdale told Ivonne Gómez that she did not know of the agreement's existence, and that she felt that her employment conditions had been altered.  However, Tina Stockdale admitted that when she accepted the employment offer she was expected to comply with Doral's policies even if she had not seen or read the policies.

48. On October 11 and 12, 2007, Tina Stockdale, Ivonne Gómez, Leiva, and Lesbia Blanco exchanged emails related to the "Hiring Bonus Repayment Agreement."

CIVIL NO. 08-2120 (JP)          -21-

49. On October 15, 2007, Ivonne Gómez, Leiva and Tina
    Stockdale met at the Human Resources Office.  Ivonne Gómez
    told Tina Stockdale that she had to sign the document to
    receive the hiring bonus.

50. Tina Stockdale testified during her deposition that she
    did not have a problem with repaying the hiring bonus if
    she resigned.  She did, however, have a problem with
    having to repay the hiring bonus if she was terminated
    "for cause" even though she did not know the meaning of
    the phrase "for cause."

51. Lesbia Blanco told Tina Stockdale that her refusal to sign
    the repayment agreement was not a way to start a
    professional relationship for someone at her level, and
    that she was not showing trust in her employer.  Lesbia
    Blanco also told Tina Stockdale she wanted her to rethink
    her decision and that they should meet again to discuss
    this matter.

52. Tina Stockdale's handwritten note on the "Hiring Bonus
    Repayment Agreement" affirmed: "I'm signing this document
    under duress.  I truly believe I have no other option
    without jeopardizing my employment and potentially my
    husband's."

53. When Tina Stockdale handed the repayment agreement with
    the handwritten note she also handed a copy of the

CIVIL NO. 08-2120 (JP)          -22-

repayment agreement without the handwritten note and a memorandum to her file dated October 19, 2007.

54. Wakeman told Makowski that Tina was not getting along with her coworkers and had made comments that were dismissive or demeaning to Puerto Ricans.  In fact, on October 19, 2007, Wakeman sent the following email message to Leiva regarding Tina: "I'm getting a lot of negative reports about her attitude.  Coach her.  She is in a key job.  She has a lot of employees reporting to her.  We need her to be motivator.  The use of comments like '3rd world' to describe Puerto Rico is offensive to those of us who call it our home.  Pls let me know how it goes."

55. David Stockdale continued to work for five months before he decided to resign because he did not want to make a rash decision; needed his income stream; and needed to figure out what Tina and he wanted to do.  Among the options was that Tina Stockdale could find a job in Puerto Rico.

56. On January 26, 2008, just five months after David Stockdale began his employment in Doral, David received a $65,000 performance bonus.

57. After David Stockdale resigned Makowski attempted to encourage him to stay at Doral.

CIVIL NO. 08-2120 (JP)          -23-

58.   David admitted that Doral wanted him to stay; there were indications that they wanted him to stay; and there were no indications that David would be fired.

59.   Accepting to come to work for Doral was a career risk, a significant career risk for Wakeman.

60.   Wakeman accepted the opportunity for several reasons, one was that in his former position he had to travel every week and he was spending too much time away from the family.

61.   Wakeman holds a CEO position at Doral Financial Corporation and CEO, President and Chairman of Doral Bank.

62.   Wakeman had a four (4) year employment contract with one year extension.

63.   As part of his compensation from Doral, Wakeman received 100,000 shares (stock grants) and options. Wakeman also received a hiring bonus of six million dollars ($6,000,000.00). This was part of "the inducement to come from General Electric to Doral," to compensate for pension benefits he would lose at General Electric, "and other factors as relocation, moving the family and the like. And for the risk of changing to Doral."

64.   If Wakeman was terminated before the term of the contract he would be entitled to receive full payment of the contract (for the term left).

CIVIL NO. 08-2120 (JP)          -24-

65. To attract qualified individuals the Bank offered substantial base salaries, bonuses and a share in profits, from the share price appreciation. The idea was that if shareholders benefitted "then we should participate in that . . . [t]hat [is] a pretty standard practice."

66. Wakeman admitted that for any good executive to come to Doral it was a risk.

67. Wakeman did not know that the equity program approved by the Board of Directors and submitted to the shareholders for approval included grants of restricted stock.

68. Wakeman discussed the equity program with Lesbia Blanco and others.

69. The stock split 1 to 20 took place in August 2, 2007.

70. Wakeman discussed his plan to turn around the bank with Plaintiff David Stockdale.

71. As to having discussed with David Stockdale the term of 3-5 years for the turn around of the Bank, Wakeman stated that it is possible. Wakeman stated that it could be in two years, or could be in five years.

72. Wakeman did not make the decision to terminate Tina Stockdale's employment. It was recommended by Blanco and Leiva, who made the decision.

73. Wakeman never spoke with Tina about any performance problem.

CIVIL NO. 08-2120 (JP)          -25-

74. Wakeman admitted that Tina's offer of employment did not include any condition to sign the "repayment agreement," or that failure to sign the same was cause for termination.

75. As of the date of his deposition Wakeman had not seen the repayment agreement.

76. Wakeman was not aware of the legal implications of the repayment agreement.

77. Wakeman remembered describing the option plan at Plaintiff's level, for about 25,000 shares.

78. Wakeman admitted that the equity plan contemplated options to be granted over a 5 year period, 20 percent per year.

79. Bank executives (Vice Presidents and Senior VPs) come from different countries, Colombia, U.S.A., Philippines, Panama, Mexico and Puerto Rico.

80. After the job offer was delivered to David Stockdale, he met with Makowski.  Makowski explained in detail the equity program, including that Plaintiff would get 25,000 shares, 20% per year (five years) and that if the bank plans were successful they would be worth $2.5 millions.

81. During a dinner, on August 2, 2007, Makowski again explained to David and Tina Stockdale the equity program.

82. Before coming to Puerto Rico, David Stockdale had opted out of the job because he wanted to be with his wife.

CIVIL NO. 08-2120 (JP)          -26-

> That is why, later, they both accepted to come to work for Doral.

83. After Tina Stockdale's termination, as stated by David Stockdale, "my wife was 2,500 miles away."

84. David Stockdale would not have accepted Doral's offer without Tina being also employed.

85. David Stockdale waited five (5) months to resign because he needed to figure out what we wanted to do, and whether Tina Stockdale would be able to get a job in Puerto Rico with a different employer.  Tina was very unhappy living in Puerto Rico because of what happened with Doral.

86. Tina Stockdale had restricted stock rights with her prior employer HSBC.

87. Tina Stockdale knew the difference between stock options and shock grants.

88. Tina Stockdale's position at HSBC required her to travel frequently to other countries, including about 189 days in India.

89. Paul Makowski explained in detail the equity program to Plaintiff Tina Stockdale during a dinner.

90. Plaintiff Tina Stockdale handled two signed "Repayment Agreements," one with a hand written note, and another without a note but accompanied with a letter to the file.

CIVIL NO. 08-2120 (JP)          -27-

> 91. Tina had been offered a promotion at HSBC prior to coming
> to Doral.

## II.  **LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993); Canal Ins. Co. v. Benner, 980 F.2d 23, 25 (1st Cir. 1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In this way, a fact

CIVIL NO. 08-2120 (JP)          -28-

is material if, based on the substantive law at issue, it might affect the outcome of the case. See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989).

On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2253, 91 L. Ed. 2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Goldman, 985 F.2d at 1116.

## III. **ANALYSIS**

### A. **Breach of Contract**

#### 1. **Availability of Contract Claim**

Defendants argue in their motion for summary judgment that Plaintiffs cannot bring a claim for breach of their employment contracts because the exclusive remedy available to Plaintiffs is the statutory severance pursuant to P.R. Laws Ann. tit. 29 § 185a, *et seq.* ("Law 80").

CIVIL NO. 08-2120 (JP)          -29-

   Law 80 imposes a monetary penalty on employers who dismiss
employees without just cause.  Law 80 applies to employees who are
"contracted without a fixed term."  P.R. Laws Ann. tit. 29 § 185a.
Puerto Rico courts have held that, for covered employees, Law 80 is
the exclusive remedy for unjust dismissal unless another law
specifically applies by its terms.  Otero-Burgos v. Inter American
University, 558 F.3d 1 (1st Cir. 2009) (citing Barreto v. ITT World
Directories, Inc., 62 F. Supp. 2d 387, 394 (D.P.R. 1999);  Biver v.
Cooperativa  Federal  de  Empleados  Telefónicos,  145  D.P.R.  165,
168   (1998);   Vélez   Rodríguez   v.   Pueblo   International,
135 D.P.R. 500 (1994), P.R.-Eng. 909576 (1994); Vargas v. Royal Bank
of Canada, 604 F. Supp. 1036, 1040 (D.P.R. 1985)).  By contrast, the
remedy available to an employee hired for a fixed term or for the
performance of a particular work, when he is dismissed before the
expiration of the contract and in contravention of the terms of the
same, is a damages action for breach of contract.  Id. (citing
Nazario   v.   Miguel   P.   Vélez   &   Asociados,   145   D.P.R.
508 (1998), P.R.-Eng. 313060 (1998)).  Thus, the applicability of
Law 80 turns on whether the individual has "contracted without a
fixed term" within the meaning of the statute.  Id.

   In order to determine whether an employee's contract is for a
fixed term, we must apply Puerto Rico contract law.  Article 1233 of
the Puerto Rico Civil Code determines the manner in which courts
should interpret contracts in dispute as to the meaning of their

CIVIL NO. 08-2120 (JP)          -30-

terms.  P.R. Laws Ann. tit. 31, § 3471; see Hopgood v. Merrill Lynch, Pierce, Fenner & Smith, 839 F. Supp. 98, 104 (D.P.R. 1993) (Pieras, J.).  Article 1233 is strict in its mandate that a court should enforce the literal sense of a written contract, unless the words are somehow contrary to the intent of the parties.  Hopgood, 839 F. Supp. at 104 (citing Marina Ind. Inc. v. Brown Boveri Corp., 114 D.P.R. 64, 72 (1983)).  For Article 1233 purposes, a term is considered "clear" when it is sufficiently lucid to be understood to have one particular meaning, without room for doubt.  Hopgood, 839 F. Supp. at 104 (internal citations omitted).

In the instant case, the parties are in dispute as to whether Plaintiffs' employment contracts were for a fixed term.  Applying the rule of interpretation established in Article 1233, the first question is whether the contract language is clear regarding the time period for Plaintiffs' employment.  The employment contracts between Doral and Tina and David Stockdale contain no written terms regarding the duration of employment.  The contracts do not specifically state that the employment is for a fixed term, or that the duration of employment is indefinite.  This silence does not indicate the presence or absence of a fixed term in a manner that is sufficiently lucid to have one particular meaning, without room for doubt.  Therefore, the Court cannot simply apply the first part of Article 1233 and enforce the literal meaning of the contract terms.  See Adria Intern. Group, Inc. v. Ferré Development, Inc.,

CIVIL NO. 08-2120 (JP)          -31-

241 F.3d 103, 110 (1st Cir. 2001) ("[t]his silence creates doubt as to the intention of the parties") (quoting <u>Catullo v. Metzner</u>, 834 F.2d 1075, 1079-80 (1st Cir. 1987)).

    Moving to the second part of the Article 1233 rule of interpretation, the next issue is to determine the parties' intent with regard to whether the employment contracts were for a fixed term. Here, the intent of the parties is the subject of a significant factual dispute. Plaintiffs allege that their communications and negotiations with representatives of Doral led to an agreement that they would be hired to work until the bank was sold in three to five years. Defendants, by contrast, allege that any discussion of a three to five year plan for the bank was merely aspirational, and did not indicate any commitment to a fixed term contract. Plaintiffs submit deposition testimony from David Stockdale in which he states, describing his conversations with representatives of Doral,

> I specifically remember Lesbia and Paul and Glen and Marito talking about a longer term commitment . . . the long term commitment seemed to come up in every meeting . . . the message I was getting is that they all wanted me . . . to commit to five [years]. We might be able to sell the bank in three, so maybe it wouldn't be quite that long.

(D. Stockdale Dep. 61:6 - 61:16, July 16, 2009.) Defendants submit deposition testimony contradicting David Stockdale's version of events. When asked in his deposition if he had told David Stockdale that Doral expected a commitment of three to five years, Makowski

CIVIL NO. 08-2120 (JP)          -32-

stated ". . . there wasn't a commitment in that sense to staying for any particular length of time." (Makowski Dep. 20:24, July 7, 2009.)

The evidentiary record does not confirm beyond genuine dispute either Plaintiffs' or Defendants' factual allegations regarding the parties' intended contract duration.   Rather, the deposition transcripts and other evidence provided indicate that the resolution of this factual dispute will require determinations of credibility and the measured weighing of evidence, a process that may not be undertaken by the Court at the summary judgment stage.  <u>Cortés Irizarry v. Corporación Insular de Seguros</u>, 111 F.3d 184 (1st Cir. 1997); <u>Adria Intern. Group</u>, 241 F.3d at 111 ("when the extrinsic evidence relevant to interpreting an ambiguous contract is contested or contradictory, summary judgment is inappropriate") (internal citations omitted). Accordingly, because the applicability of Law 80 turns on the unresolved factual issue of whether Plaintiffs' contracts were for a fixed term, the Court cannot grant summary judgment on the basis of Defendants' argument that Law 80 is Plaintiffs' exclusive remedy.

**2.   Alleged Breach of Contract By Withholding Hiring Bonus**

Defendants also argue that, even if the law recognizes the availability of a cause of action for breach of contract under the circumstances of this case, Plaintiffs' breach of contract claim fails because the specific alleged actions do not constitute breaches on behalf of Defendants.   In particular, Defendants' argue that

CIVIL NO. 08-2120 (JP)          -33-

evidence would not permit a jury to find that Doral's withholding of Tina Stockdale's hiring bonus constituted a breach of contract.

Under Puerto Rico law, the elements of a cause of action for breach of contract are: (1) the existence of a valid contract; and (2) a breach by one of the parties to the contract. <u>Torres v. Bella Vista Hospital, Inc.</u>, 523 F. Supp. 2d 123, 152 (D.P.R. 2007). In the case of an employment contract, internal company rules and regulations governing the rights and obligations of employees are considered part of the employment contract. <u>Selosse v. Fund Educ. Ana G. Méndez</u>, 122 D.P.R. 534 (1988), 22 P.R. Offic. Trans. 498, 513-14.

In the instant case, the parties agree that a valid employment contract existed between Tina Stockdale and Doral. The parties also agree that a $200,000.00 hiring bonus was one of the terms of the contract. The parties disagree as to whether Doral breached its obligation to pay the bonus.

When Tina Stockdale began work at Doral, she was informed that the hiring bonus check was ready for her to pick up. When she went to pick up the check, she was asked to sign a "Hiring Bonus Repayment Agreement" which stated, *inter alia*, that all or part of the bonus would have to be repaid if she voluntarily departed or was terminated by Doral for cause within the first two years of her employment. Defendants argue that the agreement is part of Doral's standard protocol, and that asking Tina Stockdale to sign it did not

CIVIL NO. 08-2120 (JP)          -34-

constitute a failure to comply with the terms of the employment contract. Plaintiffs argue that the agreement introduced significant new terms to the employment relationship, and that withholding the bonus unless Tina Stockdale agreed to the new terms constituted a breach of the original employment contract by Doral.

In order to resolve the issue, the fact finder must determine whether in fact Doral's rules and regulations required employees to sign the repayment agreement prior to receiving a hiring bonus. If such a rule or regulation exists, then it would be considered part of the contract between Tina Stockdale and Doral. Id. In that situation, conditioning distribution of the bonus upon the employee's signing of the agreement would not constitute a breach of contract. On the other hand, if, as Plaintiffs allege, the repayment agreement is not part of a standard Doral rule or regulation, then Tina Stockdale had no obligation to sign it and thus Doral's withholding of the bonus would constitute a breach of contract.

The evidentiary record does not conclusively establish whether or not the repayment agreement was part of the internal Doral rules and regulations. Plaintiffs argue that it was not part of Doral's internal rules and regulations because there was no written policy to that effect and other executives had not been required to sign such an agreement. Defendants argue that the repayment agreement was a company policy that had been recently introduced, and provide evidence that Tina Stockdale was not the first executive asked to

CIVIL NO. 08-2120 (JP)          -35-

sign the agreement.  The record is not sufficiently clear to permit the Court to decide this factual dispute on summary judgment. Accordingly, the Court denies Defendants' motion for summary judgment on the breach of contract claim.

### B.  <u>Constructive Discharge of David Stockdale</u>

Defendants move for summary judgment on Plaintiffs' claim that David Stockdale was constructively discharged.  Though it is not clearly listed as a separate cause of action in the complaint, constructive discharge is mentioned parenthetically in Plaintiffs' complaint.  Defendants argue that any difficulties faced by David Stockdale as a result of Tina Stockdale's termination did not rise to the level necessary to constitute a constructive discharge.

In order to succeed on a claim of constructive discharge, Plaintiffs must demonstrate that "the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." <u>Serrano-Cruz v. DFI Puerto Rico, Inc.</u>, 109 F.3d 23, 26 (1st Cir. 1997).  The standard is an objective one, and "cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held." <u>Marrero v. Goya of Puerto Rico, Inc.</u>, 304 F.3d 7, 28 (1st Cir. 2002) (internal citations omitted).  The jury must find that "the working conditions were so unpleasant that staying on the job while seeking redress would have been intolerable." <u>Id.</u>

CIVIL NO. 08-2120 (JP)          -36-

In the instant case, Plaintiffs argue that David Stockdale's working conditions changed after Tina Stockdale was terminated.  Tina Stockdale was no longer working the same shift as her husband, and ultimately she left not only Doral but also left Puerto Rico altogether.  Although the absence of David Stockdale's wife at work may indeed have been a negative change in his employment conditions, a jury could not find such a change to create conditions so difficult or unpleasant that he was forced to resign.  David Stockdale's actual employment title, responsibilities, and compensation remained unchanged.  There is no further evidence in the record of additional negative, let alone intolerable, changes in his employment conditions.  On the basis of this record, the Court grants summary judgment for Defendants on David Stockdale's constructive discharge claim.

### C.   <u>Fraudulent Inducement</u>

Defendants argue that summary judgment should be granted on Plaintiffs' fraudulent inducement claim because Plaintiffs cannot meet their burden of proof in demonstrating that Defendants engaged in fraud during the process of recruiting David and Tina Stockdale to Doral.

Under Puerto Rico law, the party alleging fraud has the burden of demonstrating: (1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an

CIVIL NO. 08-2120 (JP)          -37-

intent to defraud.  <u>Puerto Rico Elec. Power Authority v. Action</u> <u>Refund</u>, 515 F.3d 57, 66 (1st Cir. 2008) (citing <u>Microsoft Corp. v.</u> <u>Computer Warehouse</u>, 83 F. Supp. 2d 256, 262 (D.P.R. 2000); P.R. Laws Ann. tit. 31, § 3408).

The applicable Puerto Rico contract law regarding fraud has a strong underlying presumption in favor of good faith and honesty; the party alleging fraud has the burden of presenting evidence which is "strong, clear, unchallengeable, convincing, and conclusive, since a mere preponderance of the evidence is not sufficient to establish the existence of fraud in [Puerto Rico]." <u>Id.</u> (citing <u>Prado Álvarez</u> <u>v. R.J. Reynolds Tobacco Co.,</u> 313 F. Supp. 2d 61, 77 (D.P.R. 2004) (quoting <u>F.C. Imports, Inc. v. First Nat'l Bank of Boston, N.A.,</u> 816 F. Supp. 78, 87 (D.P.R. 1993)), <u>aff'd</u>, 405 F.3d 36 (1st Cir. 2005)). Accordingly, in examining a fraud claim on summary judgment, the Court's inquiry is to determine whether, viewing the evidence in the light most favorable to Plaintiffs, the record contains evidence that could be found by a reasonable juror to be sufficiently strong, clear, unchallengeable and conclusive so as to overcome the presumption of good faith and honesty. <u>Id.</u> at 67.

### 1.   Alleged False Representations

With regard to the first element of the fraud claim, Plaintiffs allege that various false representations were made by Defendants during the process of recruiting David and Tina Stockdale. Specifically, Plaintiffs allege that Defendants made false

CIVIL NO. 08-2120 (JP)          -38-

representations regarding: (1) Tina Stockdale's hiring bonus; (2) the existence and terms of Doral's equity program; and (3) the intended duration of the employment contracts.   Plaintiffs allege that Defendants made false representations as to these topics in order to lure the Stockdales to leave their existing employment and agree to come work at Doral.  In reality, Plaintiffs allege, Defendants did not intend to provide the compensation and terms of employment that were promised.

          *i.   Hiring Bonus*

     The record demonstrates, and the parties agree, that one of the terms of Tina Stockdale's employment contract was a hiring bonus of $200,000.00.  On October 11, 2007, once Tina Stockdale had arrived in Puerto Rico and began working at Doral, she received an email from Doral employee Astrid Costa informing her that the hiring bonus check was ready.  As discussed above, Tina Stockdale was then presented with, and asked to sign, a document titled "Hiring Bonus Repayment Agreement."  The repayment agreement stated, *inter alia*, that if the employee voluntarily terminates employment, or if Doral terminates the employee for cause, within the first two years of employment, the employee will repay all or part of the hiring bonus.  Tina Stockdale objected to the repayment agreement because she felt it altered the terms of her employment. On October 19, 2007, after discussions with various other Doral employees, Tina Stockdale signed the agreement

CIVIL NO. 08-2120 (JP)          -39-

but added a note to the file stating her objections and that she was signing only because she felt she had no other choice.[2]

Plaintiffs argue that by offering the $200,000.00 hiring bonus without disclosing the repayment agreement, Defendants made a false representation to Tina Stockdale. Defendants contend that Doral had every intention of paying the bonus, and that the repayment agreement is a standard procedure for executives who are paid a substantial hiring bonus. Although there is dispute as to whether or not every Doral employee receiving a hiring bonus has been required to sign such an agreement, the evidence demonstrates that it was not a procedure instituted specifically for Tina Stockdale. The record contains an agreement signed by Makowski on July 2, 2007 establishing the same contingent terms of repayment for his hiring bonus of $150,000.00.

Drawing all possible inferences in favor of Plaintiffs, the record does not contain evidence that a jury could find to be clear and unchallengeable evidence that Defendants falsely represented their intention to provide Tina Stockdale a hiring bonus of $200,000.00. Tina Stockdale was informed that her bonus check was ready and offered the opportunity to sign the repayment agreement and take the check. Other employees faced with the same situation signed

2.    The record contains two signed copies of Tina Stockdale's hiring repayment agreement. One is followed by the note to file stating her objections, and the other stands alone but contains a handwritten amendment stating "I'm signing this document under duress. I truly believe that I have no other option without jeopardizing my employment and potentially my husband's."

CIVIL NO. 08-2120 (JP)          -40-

the agreement, received their check, and encountered no further issues.   Accordingly, the Court finds that the evidence and allegations regarding Tina Stockdale's hiring bonus are, as a matter of law, insufficient to satisfy the first element of Plaintiffs' claim for fraudulent inducement.

       *ii. Equity Program*

    Plaintiffs also allege that Defendants made false representations during the recruiting process with regard to Doral's equity program.   Plaintiffs employment contracts state "[y]ou will be eligible to participate in any equity programs available for your level."   Plaintiffs allege that, in conversations during the recruiting process, they were informed that they would each receive grants of 5,000 Doral shares per year over the course of five years, for a total of 25,000 shares each.

    Plaintiffs allege that after accepting their offers, various inconsistencies and changes regarding the equity program arose. Plaintiffs allege that misrepresentations were made regarding specifics such as whether the award would be of stock options or direct share grants, whether the number of shares referred to shares before or after a planned reverse stock split, and whether the equity plan had already been approved or was still in the process of being developed.

    The record contains conflicting evidence regarding what was orally promised to the Stockdales as to the equity program, as well

CIVIL NO. 08-2120 (JP)          -41-

as the actual nature of the program and the date it was adopted and became effective.   For example, David Stockdale states in his deposition that Makowski told him at a dinner meeting after he had received his offer letter that the equity plan provided for the grant of 25,000 shares.  By contrast, Makowski stated in his deposition that he always discussed an equity plan involving stock options, not outright stock grants.

     Depending on credibility assessments, this evidence might be enough for a jury to find by a preponderance of the evidence that misrepresentations were made regarding the equity plan.  However, there is not enough in the record for a jury to find that Plaintiffs have presented the clear, unchallengeable, and conclusive evidence necessary to support a claim of fraud under Puerto Rico Law.  Id. Therefore, Defendants' representations regarding the equity plan are insufficient to satisfy the first element of Plaintiffs' claim for fraudulent inducement.

               *iii. Duration of Employment Contracts*

     As a third possible basis for demonstrating that Defendants' made false representations to Plaintiffs during the recruiting process, Plaintiffs allege that they were falsely promised employment contracts of five years, unless Doral was sold earlier.   In particular, Plaintiffs allege that this representation was false with regard to Tina Stockdale's employment, and that in fact Doral made this promise only in order to convince David Stockdale to accept his

CIVIL NO. 08-2120 (JP)          -42-

offer, while actually intending to terminate Tina Stockdale promptly or not retain her at all.

The evidence in the record regarding the reason for Tina Stockdale's termination is conflicting.  By contrast with Plaintiffs' theory, Defendants contend that Tina Stockdale was terminated because of problems that she created by refusing to sign the Hiring Bonus Repayment Agreement, and failing to develop functional working relationships with colleagues at Doral.  Defendants allege that Tina Stockdale alienated herself by making derogatory comments to colleagues regarding Puerto Rico.  In addition to deposition testimony, Defendants support this allegation with evidence of an email exchange on October 19, 2007, in which Defendant Wakeman wrote to Defendant Leiva "I'm getting a lot of negative reports about her attitude.  Coach her.  She is in a key job . . ." (Def's. Ex. XVI.)

The evidence on the issue of Defendants' representations as to the duration of the contracts is not sufficiently strong, clear, and conclusive to support a finding that Defendants' falsely promised Tina Stockdale a longer term of employment than they actually intended to provide.  Accordingly, Plaintiffs cannot satisfy the first element of their fraudulent inducement claim on the basis of alleged misrepresentations related to the employment contract duration.

CIVIL NO. 08-2120 (JP)          -43-

## 2.   Reliance, Injury, Intent

Given that Plaintiffs are not able to raise a genuine issue as to the existence of sufficiently strong and conclusive evidence to satisfy the first element of their fraudulent inducement claim, the Court need not examine the additional elements of reasonable reliance, injury resulting from that reliance, and intent to defraud. However, the Court briefly notes that Plaintiffs' sophistication and extensive business experience undercuts their allegations of unknowing reliance on Defendants' statements. Id. ("Puerto Rico law places little weight on a sophisticated and experienced business party's assertion of unknowing reliance.") (citing Ramírez, Segal & Látimer v. Riqual, 23 P.R. Offic. Trans. 156, 166, 123 D.P.R. 161 (1989)).   In conclusion, because the record does not contain evidence that a jury could find to be strong, unchallengeable, and conclusive evidence of false representations made by Defendants to Plaintiffs during the recruiting process, the Court grants summary judgment for Defendants on Plaintiffs' fraudulent inducement claim.

## D.   Corporate Immunity for Individual Defendants

Defendants Wakeman, Leiva, and Domingo move for summary judgment as to the claims against them, arguing that they are entitled to immunity for actions taken within the scope of their official capacities as officers of Doral.   Plaintiffs argue that corporate immunity does not protect the individual Defendants because said

CIVIL NO. 08-2120 (JP)            -44-

Defendants' personal involvement with the alleged facts, and their own negligent actions, create individual liability.

Under Puerto Rico law, directors, officers, or shareholders of a corporation are not subject to personal liability for actions of the corporation merely because of their corporate title or ownership role.  DACO v. Alturas de Florida Dev. Corp., 132 D.P.R. 905 (1993), P.R.-Eng. 840, 226.  However, an officer of a corporation "is liable for torts in which he personally participated, whether or not he was acting within the scope of his authority."  Escude Cruz v. Ortho Pharmaceutical Corp., 619 F.2d 902, 907 (1st Cir. 1980).  "What is required is some showing of direct personal involvement by the corporate officer in some decision or action which is causally related to plaintiff's injury."  Id.

In the instant case, Plaintiffs allege that Defendants Wakeman, Leiva, and Domingo were personally involved with the decisions and actions related to the process of recruiting Tina and David Stockdale to work at Doral.  For example, it is uncontested that on July 31, 2007, Defendant Wakeman spoke with Tina Stockdale on the phone and discussed a multi-year plan for Doral.  It is also uncontested that Defendant Domingo discussed Doral's planned equity program with David Stockdale.  With regard to Defendant Leiva, it is uncontested that he participated in the decision to terminate Tina Stockdale.

Whether these and other instances of personal involvement with the alleged facts constituted tortious conduct depends upon the

CIVIL NO. 08-2120 (JP)          -45-

jury's interpretation of the evidence.  At this stage, Defendants'
argument for blanket immunity fails because the record shows direct
involvement by the individual Defendant officers, and the applicable
law permits liability for corporate officers on the basis of their
own actions.  <u>Id.</u>  Accordingly, the Court denies the individual
Defendants' request for summary judgment on the basis of corporate
immunity.

### E.    <u>Punitive Damages</u>

Defendants move for summary judgment denying Plaintiffs' request
for punitive damages in light of the fact that punitive damages are
not available under Puerto Rico law.  <u>Noble v. Corporación Insular
de Seguros</u>, 738 F.2d 51 (1st Cir. 1984).  Plaintiffs concede that
Puerto Rico law does not permit punitive damages, and withdraw their
request for punitive damages.  Accordingly, the Court grants summary
judgment denying Plaintiffs' request for punitive damages.

## IV.  <u>CONCLUSION</u>

In conclusion, the Court **GRANTS IN PART AND DENIES IN PART**
Defendants' motion for summary judgment.  The Court **GRANTS** summary
judgment for Defendants on Plaintiffs' claims for fraudulent
inducement and constructive discharge, as well as Plaintiffs' request
for punitive damages.  The Court **DENIES** Defendants' motion for
summary judgment as to Plaintiffs' breach of contract claim against

CIVIL NO. 08-2120 (JP)            -46-

Defendant  Doral,  and  Plaintiffs'  tort  claim  against  Defendants

Wakeman, Leiva, and Domingo.

     **IT IS SO ORDERED.**

     In San Juan, Puerto Rico, this 17th day of September, 2009.


                              s/Jaime Pieras, Jr.
                              JAIME PIERAS, JR.
                              U.S. SENIOR DISTRICT JUDGE